IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

v.                                                          CASE NO. 1:10-cr-8-SPM-GRJ

BRIAN THOMAS SMITH,

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Docs. 31 and 33, a *pro se* motion and

amended motion to vacate pursuant to 28 U.S.C. § 2255 (hereafter "the motion"), and

Doc. 42, Defendant's memorandum in support of the motion, filed through counsel.

The motion stems from Defendant's guilty plea to a two-count information charging him

with attempted possession of child pornography, in violation of 18 U.S.C §

2252A(a)(5)(B) and (b)(2), and obstruction of justice, in violation of 18 U.S.C § 1519.

The Government filed a response in opposition to the motion, and the Court conducted

an evidentiary hearing at which Defendant appeared and was represented by retained

counsel.    Upon due consideration of the motion, the response, Defendant's reply, and

the evidence presented at the hearing, the undersigned recommends that the motion to

vacate be denied.

## Defendant's Plea and Sentencing

Defendant entered his guilty plea on March 2, 2010.  Doc. 29 (transcript of plea

colloquy).  The Court engaged in a colloquy with Defendant to ascertain that his plea

was made freely and voluntarily, and that it was supported by a factual basis.  Under

oath, Defendant testified that he was 37 years old at the time of the plea and had a

college education. Defendant had been a naval officer and an airline pilot. He had

never been treated for any mental illness, and denied suffering from any mental or

emotional disability at the time of the colloquy. Defendant denied consuming any drugs

or alcoholic beverages within 24 hours of the colloquy, and denied that he was under

the influence of any substance that impaired his ability to think clearly. The Court

advised Defendant of the rights he would waive by pleading guilty, including the right to

a jury trial, the right against self-incrimination, and the right to confront the witnesses

against him and to call witnesses on his own behalf. Defendant was advised of his right

not to plead guilty and to require the Government to prove his guilt to a jury beyond a

reasonable doubt. Defendant acknowledged that he understood that a plea of guilty

admitted the truth of the charges against him, and that by pleading guilty he would give

up and waive any defense he might have to the charges. Defendant acknowledged

that if his plea was accepted by the Court he would waive his right to appeal the issue

of his guilt or innocence with respect to the proof of the charges against him.

Defendant testified that he understood that if his plea was accepted, it could not later

be withdrawn. The Court then explained the offenses charged in the information, the

elements of each offense, and the maximum penalty that Defendant faced if convicted.

After apprising Defendant of his rights and the charges against him, the Court

asked the Government to place the factual basis for the plea on the record. The

Assistant United States Attorney proffered the following:

> Your Honor, first, all parties agree that if this case were to go to
> trial, the United States could produce competent, substantial evidence
> sufficient to prove beyond a reasonable doubt that the defendant is in fact
> guilty of the two offenses to which he is entering his guilty plea.
>
> Those facts would be as follows: That this case stems from a

nationwide investigation in the United States related to the distribution of child pornography through the use of computers and the Internet. In February of 2008 and September of 2008, the United States Postal Inspector Service, or USPIS, executed search warrants for the contents of an Internet forum, which is a bulletin board named thecachebbs.com used to post and distribute child pornography.

At the time of the September 2008 search, there were approximately 537 registered members of the forum. One of the registered members was identified by his screen name and Internet protocol, or IP address, as being at a residence located [in Gainesville, Florida]. This user was a member of the Internet forum since November 18, 2005.  Further investigation determined that the subject location is the residence of Brian Thomas Smith and his wife.

On August 13, 2009, an agent from the U.S. Immigrations and Customs Enforcement, accompanied by local state law enforcement officers, made contact with Brian Smith and his wife at their residence here in Gainesville, Florida. Smith and his wife were interviewed together inside the residence. The officers identified themselves, and Smith was informed of the nature of the pending federal investigation related to the distribution of child pornography through the Internet.

Smith stated that there were computer systems in his home, including a desktop computer and a laptop, and the laptop computer was observed in plain view inside Smith's residence. Smith was asked for a consent to search the computers, which he refused. Based on this refusal, agents left the residence and sought a federal search warrant to seize and search the computers inside the Smiths' residence.

After less than one hour, officers returned to Smith's residence and learned from his wife that he had just left the residence with the laptop and desktop computers. Numerous attempts were made to locate Smith, including phone contact in which he was informed of the officers' presence at his residence.

Eventually, it was determined that Smith had taken the computers to the business office of a local attorney in Gainesville, Florida.  After leaving his residence, Defendant Smith physically damaged and mutilated the computers, as well as removing many of their internal components before leaving the computers with the attorney. The attorney was contacted and allowed officers to take custody and possession of a box of computers which he had received from Brian Smith.

A federal search warrant was obtained on August 14, 2009, authorizing the search and seizure of the devices. A federal court order

was also obtained for collection of fingerprints, blood and DNA from Smith. Smith later complied with the order and this evidence was submitted for comparison to other items of evidence collected, including the computers and the cardboard box.

In summary, as a member of the Internet forum named thecachebbs.com, Defendant Smith used a computer to knowingly attempt to possess and attempt to view images and files, knowing that the images and files depicted children engaged in sexual acts with other children and adults. This offense involved at least ten images, but fewer than 150 images. Additionally, each of the images had been transported in interstate and foreign commerce by means of a computer and were produced using materials that had been mailed, shipped and transported in interstate and foreign commerce by computer.

Defendant Smith also knowingly destroyed evidence in the form of computers with the intent to impede, obstruct or influence a pending investigation by a federal agency. Furthermore, while federal and state law enforcement officers were authorized to search for or seize certain property, Defendant Smith knowingly destroyed and removed the property subject to the authorized search or seizure, and this destruction or removal was for the purpose of preventing the seizure.

Doc. 29 at 15-18.

The Court asked Defendant whether he heard the facts recited by the Government, whether the facts were true and correct, whether Defendant had in fact done what the Government said he did, and whether Defendant understood how his conduct satisfied the elements of the charges against him. Defendant stated "Yes, sir," in response to each inquiry. Defendant agreed that he understood the maximum charges that he faced, and that he had discussed the sentencing guidelines with his counsel. Defendant acknowledged that he had executed a plea agreement in which he agreed to provide cooperation and honest disclosure to the Government regarding Defendant's participation in the bulletin board. Defendant denied that any person had used threats, force, pressure or intimidation to induce him to plead guilty.

Defendant acknowledged that he was represented by Stephen Bernstein, and

that he had sufficient time to discuss his case fully with his lawyer.  Defendant agreed

that he was satisfied with his lawyer's representation of him, and that he had no

complaint regarding such representation.

Based on this colloquy, the Court found that Defendant was alert and intelligent,

understood the nature of the charges, and appreciated the consequences of his plea.

The Court found that the facts admitted by Defendant under oath were sufficient to

sustain the plea and that Defendant was fully aware of the potential sentence.  The

Court found that Defendant's decision to plead guilty was freely and voluntarily made,

and that the plea was made with the advice and counsel of a competent attorney with

whom Defendant stated he was well pleased.  Defendant then entered his guilty plea,

which the Court accepted.

In connection with the preparation of his PSR, on April 27, 2010, Defendant

provided an acceptance of responsibility statement to the U.S. Probation Officer, stating

as follows:

> In 2008 I ha[d] an addi[c]tion to pornography and while in that state
> I participated [in] an internet forum (bulletin board) called
> "thecachebbs.com".  There were images of child pornography in that
> forum but I did this secretively, without the knowledge of my wife.  On
> August 13, 2009, an agent from customs came to our residence and
> interviewed both me and my wife.  They informed me of the type of
> investigation they were conducting which was the distribution of child
> pornography through the internet.  At that time there was a desk top and
> lap top computers in our home.  I was asked for consent to search the
> computers which I refused and the agents then left my residence.
>
> During an intervening time period, I took the desk top and a lap top
> computer and attempted to destroy the hard drives for both of those.  I
> believe only the lap top was involved in any of this illegal activity but in my
> panic I destroyed both hard drives.  I then deposited the remainder of the
> broken parts with my attorney which we since turned over to law
> enforcement.

       After this investigation proceeded, I elected to make a voluntary
statement to the U.S. Attorney's Office and other investigating agencies,
informing them of my participation in this particular bulletin board and
others that I participated in, disclosing all information that I knew about
other participants.  Since I became aware of this investigation I have
sought and received therapy for my addiction and counseling in order to
save my marriage and rehabilitate myself.  I take full responsibility for my
actions and have done everything I could to assist law enforcement in
pursuing their investigative efforts in this area.  I am continuing to follow
the direction of my therapist in ongoing counseling.

PSR ¶ 20.

       Using the 2009 edition of the United States Sentencing Guidelines ("USSG")

Manual, the PSR determined that Defendant's base offense level was 18, pursuant to

USSG § 2G2.2(b)(7)(A).  Two levels were added for use of a computer pursuant to

USSG § 2G2.2(b)(6), and two levels were added because the offense involved at least

10 but fewer than 150 images, pursuant to § 2G2.2(b)(7)(A). Two levels were added for

obstruction of justice pursuant to USSG § 3C1.1, comment. n. (8).  Defendant's

adjusted offense level was 24.  Defendant received a three-level reduction for

acceptance of responsibility pursuant to USSG § 3E1.1(a) & (b), resulting in a total

offense level of 21.  Defendant had no criminal history points, and therefore his criminal

history category was I.  PSR ¶¶ 21-34.  Defendant's guideline sentencing range was 37

to 64 months.  PSR ¶ 60.

       Defendant, through counsel, filed objections to the PSR arguing that there

should be no increase in offense level for obstruction of justice and that he was entitled

to a two-level decrease because the offense did not involve distribution.  Doc. 19.

Defendant, through counsel, also filed an extensive sentencing memorandum arguing

for a downward departure to a non-prison sentence, in part due to Defendant's "super"

acceptance of responsibility.   Doc. 22.

At sentencing, the Court overruled Defendant's objections. Defendant, through counsel, offered evidence in mitigation of sentence, including the testimony of Defendant's treatment counselor, Roseanna Rutledge. Ms. Rutledge testified to Defendant's acknowledgment of having viewed child pornography and his amenability to treatment. Doc. 30.

The Court found no basis for departing from the Guidelines, noting in particular that Defendant pleaded guilty to destroying evidence. The Court sentenced Defendant to concurrent 42-month terms of imprisonment. *Id*.; Doc. 26. The Court advised Defendant of his right to appeal, his right to apply for leave to appeal without cost, and his right to be represented by appointed counsel on appeal if he was unable to hire counsel. The Court advised Defendant that if he so requested the Clerk of the Court would prepare and file a notice of appeal on his behalf. Doc. 30.

Defendant did not appeal. In the instant motion to vacate, Defendant asserts the following grounds for relief: (1) his plea was unknowing; (2) his counsel rendered ineffective assistance by failing to investigate the evidence against Defendant, failing to file a motion to suppress based upon misconduct of law enforcement, and misleading Defendant about the necessity and consequences of his plea; (3) counsel had a conflict of interest due to his own alleged misconduct relating to Defendant's disposal of evidence; (4) there was a failure of due process as a result of counsel's ineffectiveness and conflict of interest; (5) counsel failed to file a direct appeal; and (6) 18 U.S.C § 2252A is unconstitutional and void for vagueness. *See* Doc. 42 (counsel's memorandum setting forth issues raised in motion). The Government filed a response in opposition to the motion, supported by the affidavit of Mr. Bernstein. Mr. Bernstein

disputed Defendant's claims, in particular the claim that counsel engaged in misconduct relating to the destruction of evidence. Doc. 46, Exh. A. In view of the conflicting factual allegations, the Court ordered an evidentiary hearing. Doc. 62.

### Evidentiary Hearing

The evidence adduced at the hearing may be summarized as follows. Defendant testified that in August 2009 he and his wife were in the process of adopting a child from Russia. While Defendant was out of town for work, his wife Barbara called him and said that a customs officer, Agent Noriega, had called about the adoption and insisted on meeting with Barbara in her home. Defendant was suspicious that Noriega was not a customs officer, and after Defendant arrived home he called Noriega, who was "extremely rude" on the phone. Defendant reported the contact with Noriega to the police. Defendant subsequently spoke with another customs official who confirmed Noriega's identity and told Defendant that he had to speak with Noriega in order to complete the adoption. Defendant and his wife agreed to meet with Noriega. Defendant testified that he would not have consented to the meeting if he had known that Noriega was conducting a criminal investigation for possession of child pornography.

On August 13, 2009, Noriega and two other officers arrived at the Smiths' home. Defendant testified that upon entering the home the officers walked around a little, then sat at a table with the Smiths. One of the officers asked whether Defendant had wireless internet service, and Defendant responded yes and pointed out a computer. Defendant told them he had a laptop, two desktop computers, and two iPhones. Defendant testified that after a long conversation and many questions about computers, he asked Noriega what the questions had to do with the adoption. Noriega then told

Defendant that the officers were investigating him for child pornography. Defendant testified that until that point he believed, or Noriega had represented, that the interview was connected with the adoption.

According to Defendant, Noriega repeatedly asked to search the computers and Defendant felt that Noriega was putting pressure on him. Defendant had a strong physical reaction to the questioning and felt faint. Defendant testified that he told the officers to leave and that he wanted an attorney, but he also acknowledged in his testimony that he signed a written statement advising him of his *Miranda* rights.

After the officers left, Defendant fainted and then "completely freaked out." Defendant began calling attorneys and ultimately reached Stephen Bernstein. Defendant testified that he told Bernstein what happened, and Bernstein told Defendant to bring his computers to Bernstein's office. Although Defendant could not recall the sequence of events, at some time before or after speaking to Bernstein Defendant destroyed the computers. The agents had not told Defendant not to do anything to the computers.

Defendant testified that he put the destroyed computers in a box and drove to Bernstein's office. On the way to the office, Defendant's wife called and said that the officers had returned to the home. According to Defendant, Bernstein told Defendant to continue to his office. Defendant put the box in front of Bernstein's desk and discussed fees. They talked for 30 or 45 minutes, and then Bernstein told Defendant that they needed to return to Defendant's house. Defendant testified that he told Bernstein he did not know what was on the computer hard drives, and Bernstein wanted to have the computers forensically tested. Defendant testified that he told Bernstein that the agents

threatened to prosecute him for any illegally downloaded material on the computers, including adult pornography and movies.

Defendant testified that he told Bernstein he wanted to get rid of the hard drives by throwing them into Lake Alice. Defendant put the hard drives in his pocket and they left in Bernstein's car. Defendant testified that Bernstein drove to Lake Alice, parked, and made some phone calls while Defendant walked to the lake and threw the hard drives into the water. Defendant testified that Bernstein "never told me to dispose of the hard drives," but that he drove Defendant to Lake Alice "for that purpose."

When they returned to Defendant's house, an officer told Bernstein they were looking for Defendant's computers. Bernstein told the officer that there was a box of destroyed computers in his office. Defendant did not authorize Bernstein to turn the computers over.

Defendant testified that prior to his guilty plea Bernstein told him not to mention the computers in his proffer to the Government. Bernstein did not show Defendant the Government's evidence against him, but told Defendant that the Government had a good case against him. Defendant testified that he believed Bernstein because Bernstein had driven him to the lake to dispose of the hard drives. He testified that Bernstein did not know anything about computers and that he asked Bernstein to return his fees so that Defendant could hire a different attorney, but Bernstein refused and Defendant "felt like I was stuck with him."

In connection with his proffer, Defendant testified that he independently did computer research and found the names of 117 people who were exchanging child pornography. Defendant gave his file containing the information to the Government,

because Bernstein led him to believe that doing so would allow him to plead guilty to a misdemeanor, but at the time of the proffer Defendant "caved in" and agreed to plead to a felony.

Defendant testified that Bernstein did not discuss filing a motion to suppress, and Defendant did not learn that a motion could have been filed until he became a prison paralegal at USP Coleman. Defendant testified that he would not have pleaded guilty if Bernstein had told him that the officers who came to his house engaged in an illegal search and seizure.

Defendant testified that he did not learn about the obstruction-of-justice charge until three days prior to his plea, and that after learning of the charge Bernstein told him he would have to plead guilty to that as well and not to worry about it.

Defendant recalled that the defense strategy he discussed with Bernstein was to plead guilty. Defendant testified that he did not want to plead guilty but did so because he thought he had no other choice, and he believed that by pleading guilty to an attempt charge, he would face a lesser punishment. He testified that he believed the Government would file a 5K1 motion based on his cooperation, and that he would "get a misdemeanor." According to Defendant, he did not know at the time of his plea that Bernstein had a conflict of interest that would cause Bernstein to put his interests above Defendant's.

Defendant testified that he asked Bernstein to file an appeal, but Bernstein told him it was useless. Defendant wanted to appeal the imposition of lifetime supervised release and his sentence because he did not believe that the sentencing guidelines for the substantive offense applied to an attempt. After Bernstein told Defendant he did not

see a reason to appeal, Defendant said "okay." Defendant then testified that he could not swear that he specifically told Bernstein "I want to appeal." Defendant stated "I specifically gave him the impression that I was seriously interested in appealing. And then he counseled me that an appeal was just absolutely going to be useless and it was going to be an extraordinary amount of money."

Defendant's mother, Deborah Smith, testified in support of Defendant's motion. According to Mrs. Smith, Defendant and his wife came to her house in the evening following the agents' initial interview with Defendant. Mrs. Smith testified that Defendant told her that he had taken the destroyed computers to Bernstein's office, and that he and Bernstein decided to dispose of the hard drives before returning to Defendant's house. Defendant stated to Mrs. Smith that he threw the hard drives into Lake Alice.

Defendant's brother-in-law, Roger Morgan, testified that on November 7, 2009, he attended a family gathering with Defendant. Defendant told Morgan that Bernstein knew he was going to throw the computer hard drives into Lake Alice.

In opposition to Defendant's motion, the Government called as a witness Alachua County Sheriff's Office Detective April McCray. McCray is a member of the Internet Crimes Against Children (ICAC) Task Force, and she accompanied ICE Special Agent Carlos Noriega and another officer to Defendant's residence on August 13, 2009. Noriega informed McCray that Defendant was a suspect with respect to online sharing and distribution of child pornography.

McCray, Noriega, and the other officer went to Defendant's home to conduct a "knock and talk." The officers had badges, firearms, and handcuffs. After knocking on Defendant's door the officers identified themselves and were invited into the house by

Defendant's wife, Barbara Smith.  McCray observed computers in the home office and  a laptop computer in the living room.  An IP address previously had been identified with the residence, and the officers had confirmed that it was Defendant's residence.

After the officers sat down at Defendant's dining room table, Defendant's wife asked if the officers were there about the pending adoption.  McCray testified that Noriega then explained that the purpose of the visit was the criminal investigation of possession and distribution of child pornography.  After that, the officers engaged in conversation with the Smiths to build a rapport, including discussing the pending adoption.  The Smiths were advised of their Miranda rights and executed a written acknowledgment of same.

As the officers began to ask questions regarding the details of the criminal investigation, Defendant began to sweat and became unwell.  McCray asked him if he needed medical treatment or something to drink, and Defendant went to the kitchen to get a drink and wipe off the sweat.  Noriega asked for consent to forensically preview Defendants' computers, but Defendant denied consent and the officers left.

McCray was concerned that evidence in the computers would be destroyed.  About 20 to 30 minutes after leaving the residence, the officers returned and locked it down in order to try to obtain a search warrant.  Mrs. Smith told the officers that Defendant had left the home with the computers.  He returned a couple of hours later with Bernstein.  The officers inquired about the computers, and Bernstein told them that Defendant had shown up at his office with a box of computer parts, and the box was still at Bernstein's office.   Bernstein did not say anything about the hard drives.  The officers went to Bernstein's office to retrieve the box but the hard drives were never recovered.

On cross-examination, McCray testified that she believed the officers had probable cause to get a search warrant before they entered the Smith's home. McCray reiterated that the Smiths were told at the outset that the officers were conducting a criminal investigation. McCray was shown a copy of Agent Noriega's report, in which he stated that the Smiths were told that the interview had to do in part with the adoption, without going into further details of the investigation. McCray testified that she believed her recollection was correct and that the Smiths were told at the beginning of the interview that the investigation was for child pornography.

The Government also called Stephen Bernstein as a witness in opposition to Defendant's motion. Bernstein testified that he understood from prior cases that when a defendant brings him evidence related to a crime he is required to turn the evidence over to law enforcement without becoming part of the chain of custody. When Defendant contacted him after the interview with law enforcement, Bernstein suggested he bring the computers in for expert analysis. Defendant did not tell him what was on the computers. When Defendant arrived, he had a box with broken computers and he told Bernstein he had smashed them. Defendant received a call that the officers had returned to his house and wanted to see him. Defendant asked Bernstein to drive because Defendant was too shaky. Defendant gave Bernstein directions to his house. Bernstein testified that he did not assist Defendant in destroying or concealing evidence. When they returned to Defendant's house, the agents were waiting to see if they could get a search warrant. Bernstein informed the officers that Defendant had brought a box of computer parts to his office, after it became obvious to Bernstein that he had something that would be evidence in the case. Bernstein testified that he believed he

had an ethical obligation to turn the box over to law enforcement.

At a subsequent meeting with the U.S. Attorney, Bernstein reviewed the Government's evidence in the case. Bernstein testified that based on his review of the Government's evidence linking Defendant to an internet bulletin board containing child pornography through Defendant's IP address and email account, he believed the Government clearly could make a case against Defendant. Bernstein negotiated with the U.S. Attorney to limit the number of images for which Defendant could be held responsible to a range of 15 to 150. They also discussed a charge of attempted possession, rather than a charge of receipt of child pornography that would have exposed Defendant to a five-year mandatory minimum sentence. Bernstein testified that this afforded Defendant "a very advantageous plea deal" in view of the Government's evidence. Bernstein testified that his preference was not to proceed to indictment and formal discovery because of the potential exposure to a greater penalty. Bernstein counseled Defendant that as a strategic matter the better route was to negotiate a plea and limit the sentencing exposure rather than pursue a trial.

Bernstein testified that Defendant conducted his own research and investigation regarding the charges, and spoke with other attorneys. Defendant insisted that evidence against him could be suppressed because the agents assertedly tricked him into having an illegal conversation, but Bernstein disagreed with Defendant's view. He testified that in his view there was not a basis for a motion to suppress. He and Defendant elected a strategy to plead to an information, and that strategy would preclude a motion to suppress.

Defendant came up with a plan to identify other individuals involved in child

pornography, and identify such individuals to the Government. At debriefing, however, Defendant's information was not well received. Bernstein considered an attack on the constitutionality of the statute under which Defendant was prosecuted, but that did not seem like a viable alternative and he and Defendant had made a strategic decision not to take an adversary position.

With respect to Defendant's PSR, Bernstein considered whether Defendant was eligible for a three-level reduction pursuant to U.S.S. G. § 2X1.1, based on an attempted possession offense, but his review of that guideline reflected that Defendant would not be eligible because of an exception for defendants who have done everything necessary to complete the offense. Bernstein asserted objections to the enhancement for obstruction of justice, but there were no other objections that he believed should be asserted. Bernstein's strategy for mitigating Defendant's sentence was to deconstruct the guidelines and argue to the Court that the guidelines were excessively harsh and that the Court should depart below the guidelines. Bernstein used the services of a psychological expert in support of this strategy, and the expert testified at Defendant's sentencing hearing.

Bernstein testified that Defendant was upset with his sentence and they discussed an appeal. Bernstein advised Defendant that he believed they had taken their best shot at mitigating his sentence, and that he could not in good conscience urge Defendant to pay Bernstein to pursue an appeal. If Defendant had asked Bernstein to file an appeal anyway, Bernstein testified that he "absolutely" would have done it. He testified that at no time did Defendant direct him to file an appeal.

On cross-examination Bernstein testified that he had no knowledge of what was

on Defendant's computers before he brought them to Bernstein's office, and did not

know until Defendant arrived with the box that he had destroyed them.  Bernstein

refused to touch them.  Bernstein did not know whether the hard drives were with the

computers, and Defendant did not show him the hard drives or talk about them.

Bernstein denied that he made any stops on the way back to Defendant's house, and

denied that Defendant told him he wanted to throw the hard drives in the lake.  Bernstein

testified that he would have remembered if Defendant had said he was going to throw

the hard drives in the lake.  Bernstein testified that "I do not remember stopping

anyplace."  When counsel inquired whether it was possible that he stopped and did not

remember, Bernstein stated "Well, when you ask it that way, yes, it's possible, but I don't

think so."

When they arrived back at Defendant's house they sat and waited for a couple of

hours because the officers were trying to get a search warrant.  At some point, Bernstein

told the officers that Defendant brought the computers to his office and that he was

surprised at the condition they were in.

Bernstein testified that he did not obtain discovery from the Government prior to

Defendant's plea.  He did share documents in a meeting with the AUSA.  He did not

arrange for Defendant to review the Government's evidence.

Bernstein testified that he had not previously seen Agent Noriega's report, but

that he did not think the report would have affected the decision not to pursue a motion

to suppress.  He did not retain an expert to explain how the bulletin board worked

because Defendant explained it to him, in addition to what he learned from the

Government.  In view of the defense strategy, Bernstein concluded that retention of such

an expert was not a good use of resources. The defense strategy was focused on

eliminating any potential mandatory minimum sentence and decreasing the maximum

sentence exposure by a avoiding a charge of receipt of child pornography.

Bernstein reiterated on cross-examination that Defendant was advised of his right

to appeal, that he was angry about his sentence, but he did not tell Bernstein that he

wanted to appeal. He described Defendant as "astute on his legal rights," and believed

that Defendant fully understood his right to appeal. Regarding the overall defense

strategy, Bernstein testified that "[w]e had a series of discussions, and we made a

strategy decision on which way to go, and he was on board with going the proffer,

cooperation, plea agreement that we engaged in."

### Discussion

Defendant, through postconviction counsel, enumerates the following grounds for

relief: (1) Defendant entered an unknowing plea; (2) Defendant received and was

prejudiced by ineffective assistance of counsel who, among other things, failed to

investigate the evidence and file a clearly meritorious motion to suppress evidence

based on law enforcement misconduct, and misled Defendant about the necessity and

consequences of his guilty plea; (3) Defendant's counsel labored under a conflict of

interest, to wit, his own alleged misconduct in destruction of evidence, depriving

Defendant of effective assistance of counsel which resulted in prejudice; and (4) There

was a failure of due process as a result of the ineffective assistance of counsel who had

a conflict of interest. Doc. 42. Defendant enumerated two additional grounds in his *pro*

*se* motion, and postconviction counsel states that he will rely on the facts and arguments

made in the *pro se* motion: (5) Denial of the right of direct appeal; and (6) 18 U.S.C.

§ 2252A is unconstitutionally overly broad and void for vagueness on its face and as applied. *See* Docs. 31, 33, 42. Defendant's claims will be addressed in the order in which they are briefed in counsel's memorandum.

## Standard of Review

A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded the court's jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999). Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited. "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). Further, disposition of a claim of error on direct appeal precludes further review in a subsequent collateral proceeding. *See, e.g., Mills v. United States*, 36 F.3d 1052, 1056 (11th Cir. 1994).

## Guilty Plea and Ineffective Assistance of Counsel

By entering a voluntary plea, a defendant waives several rights, including the right to a jury trial, to the assistance of counsel at trial, to raise a defense, and to confront his accusers. *Boykin v. Alabama*, 395 U.S. 563, 573 (1989). Further, a voluntary and intelligent guilty plea forecloses federal collateral review of alleged constitutional errors preceding the entry of the plea, including claims of ineffective-assistance that do not

attack the voluntariness of the plea. *See Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973); *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992); *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983).

Because Petitioner's claims raise the issue of counsel's effectiveness, a review of *Strickland v. Washington* is appropriate. To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697.

In the guilty plea context, to show prejudice Petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The requirement of a showing of prejudice in the guilty-plea context serves "the fundamental interest in the finality of guilty pleas." *Id*. at 58. The inquiry as to whether a reasonable probability exists that a defendant would have insisted on going to trial "should be made objectively, without regard for the 'idiosyncracies of the particular decisionmaker.'" *Id*. at 60 (quoting *Evans v. Meyer*, 742 F.2d 371, 375 (7th Cir. 1984)).

In reviewing counsel's decisions, "the issue is not what is possible or [even] 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)). Defendant must "prove by a preponderance of competent evidence, that counsel's performance was unreasonable." *Id*. (citing *Strickland*, 466 U.S. at 688). This

burden, though not insurmountable, is heavy. *See id*. at 1314 (citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986)). The Court's scrutiny of counsel's performance is highly deferential, and the Court indulges in a strong presumption that counsel performed reasonably. *Chandler*, 218 F.3d at 1314.

### *Claims 2 & 3 Ineffective Assistance of Counsel*

Defendant argues that if counsel had obtained full discovery and properly advised him about the illegality of the initial entry by law enforcement into his home, had properly suppressed the interview he gave law enforcement and subsequent evidence, and had properly advised Defendant about the consequences of his plea, Defendant would not have agreed to plead guilty. He further contends that if he had been aware of the prejudice to his legal representation resulting from counsel's conflict of interest caused by counsel's alleged misconduct, Defendant never would have continued with his defense counsel and would not have agreed to enter his plea of guilty.

### *Motion to Suppress*

Defendant's allegation that counsel erred in failing to file a motion to suppress is premised upon his claim that law enforcement gained access to his home and interviewed him by engaging in deceit and misrepresentation regarding the true purpose of the interview. To prevail on his claim that counsel rendered deficient performance in this regard, Defendant must establish that a motion to suppress would have asserted a meritorious Fourth Amendment claim. *Kimmelman*, 477 U.S. 365 at 382. Further, Defendant must show that but for counsel's failure to file a motion to suppress, he would not have pleaded guilty and would have insisted on going to trial.

Based on the record as a whole, including the record of Defendant's plea and

sentencing and the testimony adduced at the evidentiary hearing, the Court finds that

Defendant has failed to establish that a meritorious Fourth Amendment claim could have

been asserted.  The Fourth Amendment provides that: "The right of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  The Fourth

Amendment is not implicated by entry onto private land for legitimate police purposes

unconnected with a search of the premises.  *United States v. Taylor*, 458 F.3d 1201,

1204 (11th Cir.2006).  "Absent express orders from the person in possession, an officer

may walk up the steps and knock on the door of any man's castle, with the honest intent

of asking questions of the occupant thereof."  *Id.* (internal quotation marks omitted).

This principle is referred to as the "knock and talk" exception to the Fourth Amendment's

warrant requirement.  *See, e.g., id.* at 1205.  Additionally, a warrant is not required when

a search is made pursuant to voluntary consent.  *Illinois v. Rodriguez*, 497 U.S. 177, 181

(1990).  Consent is voluntary "if it is the product of an essentially free and unconstrained

choice."  *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.2001) (internal

quotation marks omitted).  Review of a consent determination usually turns on "credibility

choices resulting from conflicting testimony."  *United States v. Garcia*, 890 F.2d 355, 359

(11th Cir. 1989).

McCray testified that Mrs. Smith answered the officers' knock on the door, and

then invited the officers in to talk.  The officers bore obvious indicia of law enforcement –

badges, firearms, and handcuffs – and there is no evidence that their entry into the

home was non-consensual.  McCray testified that an IP address had been identified with

the residence, and that computers were easily visible when they entered the home.

McCray recalled that after Mrs. Smith asked whether the officers' visit concerned the pending adoption, the Smiths were advised that the purpose of the visit was a criminal investigation of child pornography. The Smiths then voluntarily executed a written acknowledgment and waiver of their *Miranda* rights before answering further questions. The Court finds McCray's testimony recounting these events to be highly credible.

McCray's testimony is also consistent with Defendant's statements under oath at the plea colloquy, during which Defendant attested to the accuracy of the Statement of Facts which recounted that he was informed that the nature of the investigation was the distribution of child pornography through the internet. It is also consistent with Defendant's statement during the preparation of his PSR in which he supported his claim to an acceptance-of-responsibility reduction in offense level with a statement acknowledging that the officers informed him that their investigation concerned the distribution of child pornography. Having reviewed the record and observed the witnesses' demeanor at the evidentiary hearing, the Court finds that Defendant's self-serving testimony to the contrary lacks credibility.

As further support for his claim that the officers gained entry to his home through the use of deceit, in violation of his Fourth Amendment rights, Defendant cites *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). In *Tweel*, the Court observed: "It is a well established rule that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation" of an IRS agent. *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir. 1977). "A party alleging ineffective consent on this ground must show affirmative acts by the agent that materially misrepresent the nature of the inquiry, and the showing must be by clear and convincing

evidence." *United States v. Wuagneux,* 683 F.2d 1343, 1347 (11th Cir. 1982).

In *Tweel*, the defendant was the subject of an IRS audit. The revenue agent conducting the audit represented to defendant's accountant that no "special agent" was involved in the audit, thus creating the impression that the audit was civil in nature. The accountant provided documents that were later used against Tweel in his criminal prosecution. Although it was technically correct that no "special agent" was involved, in fact the audit had been requested by the Justice Department's Organized Crime and Racketeering Section, which was only involved in criminal investigations. The Court explained that:

> The burden for determining whether or not the government has resorted to a deception is on the moving party . . . . "We conclude that the mere failure of a revenue agent (be he regular or special) to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do not constitute fraud, deceit and trickery. Therefore, the record here must disclose some affirmative misrepresentation to establish the existence of fraud, and the showing must be clear and convincing . . . . Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."

*Id*. (quoting *United States v. Prudden*, 424 F.2d 1021, 1032-33 (5th Cir. 1970)). The Court found that the agent's failure to apprise defendant of the obvious criminal nature of the investigation was "a sneaky deliberate deception . . . and a flagrant disregard" of his rights. 550 F.2d at 299.

In this case, the officers were not revenue agents whose appearance might create ambiguity as to the civil or criminal nature of the visit. The officers bore badges, firearms, and handcuffs. McCray's testimony reflects that when the officers were asked about the nature of the visit, they informed the Smiths of the child pornography investigation. On this record, the Court concludes that there was not an "inquiry left

unanswered" that could have mislead the Smiths about the nature of the officers' visit.

Defendant points to Agent Noriega's written report as further support for this claim. According to the report, Mrs. Smith asked whether the interview was part of the adoption process, and Noriega stated that it had to do "in part with the adoption process without going in to further details of the investigation." After asking Defendant about his employment and whether he had any computers, Noriega "discussed with [Defendant] the nature of the pending federal investigation related to the distribution of child pornography through the internet." Deft's Exhibit 3. While the report therefore differs somewhat from McCray's testimony, McCray was specifically questioned about the report and testified to her personal recollection that the Smiths were told at the beginning of the interview that the investigation was for child pornography. On this record, Defendant has failed to meet his burden of showing by clear and convincing evidence that the officers resorted to deception in gaining access to his home, or made any affirmative misrepresentation about the nature of the visit. *See Tweel*, 550 F.2d at 299.

Even if the Court credited Defendant's testimony that he initially believed the purpose of the officers' visit was to discuss the pending adoption, he has failed to show that the Government gained any suppressible evidence as a result of the "knock and talk" and entry into the home. Defendant contends that the entry allowed the officers to confirm the existence of computers, but the officers had already developed evidence that Defendant's residence was associated with an IP address linked to child pornography, and therefore it could readily be assumed that there were computers in the home. After Defendant was advised of the child pornography investigation, he executed

a waiver of his *Miranda* rights and thus there was no basis for suppressing his subsequent statements or physical reactions. The officers obtained no suppressible evidence from the computers because Defendant exercised his right to refuse consent to search them and then destroyed them when the officers left to obtain a search warrant.

The Court finds credible Bernstein's testimony that Defendant agreed to pursue a plea strategy in order to avoid a potential mandatory minimum sentence. In view of this strategy, and in light of the evidence showing that a motion to suppress would have lacked merit, the Court concludes that it was reasonable for counsel not to pursue such a motion. Given the low probability of success of a motion to suppress and the significant benefits of pleading guilty – in particular the avoidance of a mandatory minimum sentence – Defendant has failed to show that but for counsel's failure to file a motion to suppress there is a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial. Thus, the Court concludes that this ineffective-assistance claim fails on both the performance and prejudice prongs necessary to establish that Defendant's constitutional rights were violated.

### *Conflict of Interest Due to Alleged Misconduct*

Defendant contends that Bernstein rendered ineffective assistance due to a conflict of interest that stemmed from his alleged involvement in the destruction of evidence. Defendant argues that Bernstein urged him to plead guilty in order to avoid scrutiny into his own actions.

When an ineffectiveness claim is predicated on an alleged conflict of interest, the petitioner must show that (1) defense counsel labored under an actual conflict of

interest; and (2) the actual conflict "adversely affected" the lawyer's performance.

*Lightbourne v. Dugger*, 829 F.2d 1012, 1023 (11th Cir.1987) (per curiam) (citations

omitted) (conflict stemming from counsel's cross-examination of former client).   An

attorney's fear that vigorously representing his client could prompt investigation into his

own wrongdoing can create a conflict of interest.   *United States v. Jones*, 900 F.2d 512,

519 (2d Cir.1990).   But "[a]llegations of wrongdoing alone cannot rise to the level of an

actual conflict unless the charges have some foundation."   *Id.*

The Court finds that Defendant has failed to adduce credible evidence that

counsel behaved improperly such that an actual conflict of interest was created.   In

entering his plea, Defendant attested to the truth of the Statement of Facts, which

recounted that Defendant physically damaged and mutilated the computers *before*

leaving them at counsel's office.   Defendant represented in his acceptance-of-

responsibility statement that he destroyed the computer hard drives and "*then*"

"deposited the remainder of the broken parts with my attorney which we since turned

over to law enforcement."   These statements are consistent with Bernstein's testimony

at the evidentiary hearing, which the Court finds to be credible.   The Court finds that

Defendant's testimony that Bernstein aided him in the destruction of the hard drives is

not credible, particularly when it is contrasted with his statements during the plea

proceedings.

Although Defendant presented the testimony of two family members to the effect

that Defendant implicated Bernstein in the destruction of the hard drives prior to his plea,

inasmuch as this testimony was based on Defendant's own comments and not

information personally known to the witnesses, the Court accords this testimony little

weight.  If Defendant made the comments, they may just as readily be construed as face-saving statements to absolve himself of responsibility with his family members.  On this record, the Court finds that Defendant's charge of wrongdoing by counsel lacks foundation because it is in direct contrast to his sworn acknowledgment of the statement of facts during the plea colloquy and contrary to Defendant's statement in his acceptance of responsibility statements. The Court, therefore, concludes Defendant has not shown that an actual conflict of interest was created in violation of Defendant's right to conflict-free counsel

Defendant also argues that counsel acted improperly in telling him to bring the computers to counsel's office for possible evaluation by an expert and in subsequently advising the officers that the computers were in a box in counsel's office.  The Florida Bar's Rules of Professional Conduct forbid a lawyer from engaging in unlawful conduct and provide that a lawyer may not obstruct access to evidence or unlawfully destroy or conceal evidence that the lawyer knows is relevant to a pending proceeding.  *See* Fla. Bar Rules 4-3.4, 4-8.4.  The Court finds that Bernstein did not act unlawfully or unethically in telling Defendant to bring him the computers because counsel testified that Defendant initially told him he did not know what was on the computers.  After returning to Defendant's home and learning that the officers were seeking a search warrant for the computers, counsel was ethically obligated to turn over the evidence.  Counsel conceded that it was error, however, to tell the officers that Defendant had brought him the box because counsel thereby revealed an implicit privileged communication.  *See e.g. United States v. Rhea*, 33 MJ 413, 419 (C.M.A. 1991).  Defendant, however, has not shown that this error resulted in any prejudice to him because the officers had

already learned from Mrs. Smith that Defendant collected all of the computers in the home and left with them following the interview, and it was therefore obvious that Bernstein had received the computers from Defendant. Defendant has not shown a reasonable probability that but for Bernstein's actions in turning over the evidence, Defendant would not have pleaded guilty and would have insisted on going to trial.

### *Claims 1 and 4: Unknowing Plea, Due Process*

Defendant contends that his guilty plea was unknowing and he was deprived of his right to due process as a result of the denial of effective assistance of counsel. Because these claims are part and parcel of Defendant's ineffective assistance claims, for the same reasons discussed above Defendant has not shown that he is entitled to any relief.

### *Claim 5: Denial of Right to Appeal*

Defendant contends that he was denied his right to appeal his conviction and sentence because counsel told him that an appeal would be "expensive and useless" and did not speak with him about his desire to file a direct appeal. Doc. 31 at 23.

It is well-established that a lawyer who disregards his client's instructions to file a notice of appeal acts in a professionally unreasonable manner. *Roe v. Flores–Ortega*, 528 U.S. 470 (2000). Even when a defendant does not specifically instruct his lawyer to file an appeal, the Court must determine whether his lawyer consulted with him about an appeal. *Id.* "[A]dequate consultation requires informing a client about his right to appeal, advising the client about the advantages and disadvantages of taking an appeal, and making a reasonable effort to determine whether the client wishes to pursue an appeal, regardless of the merits of such an appeal." *Thompson v. United States*, 504

F.3d 1203, 1206 (11th Cir. 2007) (emphasis in original).

Based on the testimony at the evidentiary hearing, the Court concludes that Defendant did not specifically instruct Bernstein to file a notice of appeal. Defendant testified that he could not swear that he specifically told Bernstein "I want to appeal." Defendant rather testified that "I specifically gave him the impression that I was seriously interested in appealing. And then he counseled me that an appeal was just absolutely going to be useless and it was going to be an extraordinary amount of money." Bernstein testified that at no time did Defendant direct him to file an appeal. He discussed an appeal with Defendant, and advised him that he believed they had done their best to mitigate his sentence, and that he could not in good conscience urge Defendant to pursue an appeal. On this record, the Court finds that Bernstein did not fail to file an appeal after being instructed to do so, and that counsel adequately consulted with Defendant regarding his right to appeal. Defendant has failed to show that counsel's performance was deficient in this regard.

### *Claim 6: Constitutionality of 18 U.S.C § 2252A and Sentencing Claims*

Defendant contends that the statute under which he was convicted; 18 U.S.C. § 2252A, is unconstitutionally overbroad and void for vagueness on its face and as applied. He also contends that the Court should have applied a three-level reduction in the offense level pursuant to U.S.S.G. § 2X1.1, which applies to attempt offenses. Doc. 31.

By failing to appeal his conviction and sentence, Defendant is procedurally barred from raising these challenges under § 2255. *See United States v. Nyhuis*, 211 F.3d 1340, 1343 n.3 (11th Cir. 2000). Defendant cannot show that the procedural default

should be excused on ineffective-assistance grounds because, as discussed above, he has not shown that his counsel performed deficiently with respect to his right to appeal. Moreover, it is clear that the asserted grounds would have been rejected on appeal. The Eleventh Circuit has rejected an identical challenge to the constitutionality of the child pornography statutes.  *See United States v. Woods*, 684 F.3d 1045 (2012).  The three level reduction under U.S.S.G. § 2X1.1 is inapplicable to Defendant's offense because it expressly excludes attempt offenses where "the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense."  Accordingly, Defendant presents no basis for relief under § 2255.

## Certificate of Appealability

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2255 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

Rule 11(a) also provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to

the attention of the district judge in the objections permitted to this report and

recommendation.

In light of the foregoing, it is respectfully **RECOMMENDED** that the motion to

vacate, Doc. 31, be **DENIED**, and that a COA be **DENIED.**

**IN CHAMBERS** this 30th day of October 2012.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**